and Sodexo, Inc. May it please the Court, my name is Roy Englert. We have you down as going second, but I certainly recognize you, Mr. Englert, and didn't want to say Mr. Nager when I saw you walk to the podium. Well, with the Court's permission, I will go first, and I'll take eight of the fifteen minutes, Mr. Nager will go second and take seven minutes, and we'll reserve respectively two minutes and one minute for rebuttal. Great. Thank you. I plan to address the Morton Salt inference of injury to competition. I also plan to address the meeting competition defense. My third issue is the contempt order, but I'll rest on the briefs unless I have extra time at the end of my argument. The evidence shows that even if everything Feesers experts said is correct, differential pricing on Michael Foods products would make no more than an 0.4 percent difference in the cost of the food service package sold to a customer. The District Court even made a specific finding at page 45 that egg and potato products constitute a small portion of any individual customer's food purchases from Feesers and Sodexo. There is no finding that any customer switched between self-operation and management by Sodexo because of pricing by Michael Foods. Instead, the District Court said that the relevant... Because of pricing or solely because of pricing? Neither one. There's no finding either way. The District Court said the relevant competition was the broad competition to switch customers between self-op and management, but the Court switched its focus from that competition to individual product prices when it came time to assess substantiality and the impact of the differential on competition. Mr. Engler, let me back you up a little bit here because this panel must of course proceed and recognize fully the opinion of the prior panel in this case that was antecedent to the trial. And there are frequent invocations in your adversary's brief about the extent of application of law in the case and the determinations that were made by the earlier panel. To what extent does the language of the earlier opinion constrain this Court in the focus that we take in our review now? What did the first panel really do? Okay. With respect to the Morton Salt issue alone, I'm just going to focus on that for the moment. The Court did the following. It said, if a substantial price case, the Court left wide open the possibility of rebuttal of the prima facie case and the Court also didn't spell out what it meant by substantiality. So the question of law, whether substantiality means individual pricing products differential or means the differential of the bottom line service package was not addressed by the prior panel. There's no rejection of or acceptance of the Minneapolis Honeywell case, however, is distinguishable in that it was a components case, wasn't it? Well, that one case was manufactured components, but it's the start of an unbroken line of 58 years of case law. The FTC's opinion from 1964 in Quaker Oats is a very important data point in that line of case law, because that represented acceptance by the expert agency of the theory of Minneapolis Honeywell. And the 1970 whatever decision in the Marty's Floor case from the Fourth Circuit is a case specifically applying the Minneapolis Honeywell line of cases to a service industry in which the price of the differentially priced product was a component of an ultimate service, not a component of the manufactured product. So although there's no Third Circuit case law commenting on Minneapolis Honeywell, the unbroken line of cases from every other circuit and the expert agency applies Minneapolis Honeywell whenever the differentially priced product is integrated into something larger before being sold to the ultimate consumer or to the person on who for whose competition we're worrying for purposes of the Robinson Patent Act. So I would suggest that the court should follow that unbroken line of cases and that it's applicable here, but if the court has any doubt about whether to apply Morton Salt or the Minneapolis Honeywell line of cases, I would suggest that the correct mode of analysis is to pay attention to the policy of encouraging price cuts and competition and therefore narrowly construing the Robinson Patent Act's prohibitions. This is a policy stated by the Supreme Court very recently and as far ago as 1963 in the automatic canteen case. It's a policy stated by this court even more recently than by the Supreme Court in footnote 17 of the Toledo Macapin. I suppose this is a question best directed to your adversary and hopefully I remember to do that at the outset, but are you aware of any other case that has made such an expansive application of price discrimination as occurred here? I actually am because from 1948 when Morton Salt was decided to 1951 when Minneapolis Honeywell was decided, the FTC ran hog-wild with the Morton Salt inference and applied it to every component of everything. It got shot down in Minneapolis Honeywell and it acquiesced in Minneapolis Honeywell starting in 1964. So if we go back to the three-year period from 48 to 51 this might have been the law. Since 1951 every other circuit has said this is not the law. Now the policy of encouraging price cuts and competition is a good segue into the second issue I'd like to discuss which is the meaning competition defense. The starting point for the district court's analysis of that issue should have been the Supreme Court's for the proposition that the meeting competition defense may be categorically unavailable and I'm quoting where a seller has limited information about the prices offered by his competitors. That was the wrong theme for the district court to start with because less than a year after writing those dicta in GIPSUM the Supreme Court addressed that exact situation in a square holding in A&P. What is our standard of review with respect to the meeting competition defense because I think GIPSUM refers to it as being a fact-based inquiry. It depends on and A&P if I recall suggests that our inquiry our review here may be more in the nature of plenary. Well A&P said the facts of that case which are weaker than the facts of our case were so clear that it could be decided as a matter of matter of law. I don't think that's plenary review and if you look at false city Vanco which is the next case in the line there were findings of a lack of good faith by both lower courts in that case and yet the Supreme Court reversed it said that courts applied the wrong legal standard but then it left open further factual determinations on remand. In this case if what Judge Rambo had been to say I find subjective bad faith on the part of Vicki Wass or what she had done would have been to say I find Vicki Wass not credible then this court might engage in deferential review but that's not what she did and if you look at page 77 of the appendix and actually with the last paragraph of what purport to be her findings of fact she says the greater problem is that acceptance of Wass' assumption would be contrary to the primary purpose of the Robinson-Patman Act and she goes on to talk about her understanding of the purpose of the act as the reason why she rejects Wass' testimony as adding up to good faith. I would respectfully suggest that that is a legal conclusion. Excuse me would you just just help us a little bit would you explain please at the basic level just how this meeting competition defense ought to play out and just what kind of evidence should be proper in an effort to meet it? Sure in the abstract the way it should play out is that whenever a reasonably prudent business person does what reasonably prudent business people do to respond to competition they should be entitled to make the sale that's actually the Supreme Court's language entitled to make the sale. What factors does the court look to? It's a flexible and pragmatic inquiry that's what falsity Vivanko says. Gibson lists four factors all of which we meet here which include past familiarity with the buyer, efforts to verify. In this case we have an ongoing relationship between Michael Foote and Sodexo. Sodexo is a major customer of Michael's are they not? Absolutely. Just how explicit do these conversations need to be between seller and there is actually a competition out there for Sodexo's purchases and how much can be inferred from the existence of an ongoing relationship between these two sophisticated parties who have to know the market that they're dealing? Well I completely agree with what I take to be the thrust of your question which is when sophisticated parties who do understand the marketplace make how explicit does it have to be? It has to be about one-tenth as explicit as it was here. Why do I say that so boldly? Because in the A&P case the entire conversation was I have a bid in my pocket and you're not even close okay what do I have to do? Well $50,000 wouldn't be a drop in the bucket. That's it. Those are all the facts of A&P and the Supreme Court said that is enough to conclude as a matter of law that the meeting competition defense is available. I would suggest the very testimony Judge Rambo quoted from Vicki Wass on pages 67 to 77 is at least 10 times as explicit as the A&P facts and indeed if you go to the rest of Vicki Wass' testimony that she didn't quote you see that there was a year-long negotiation for the potato contract with a great deal of back-and-forth. You see that the egg contracts were the subject of weeks of negotiation so there was very very extensive back-and-forth in this case much more than an A&P. Now since I do have just a minute remaining with regard to the contempt issue let me just invite the court to read the letter as pages 267 and 268 of the Joint Appendix. The second paragraph says Michael Foods will comply with the court's injunction by suspending sales and shipments to FISA until the resolution of its appeal of the court's judgment. Comply with by doing something the statute explicitly permits it to do. Four paragraphs later the letter says of course if FISA's will stipulate to a stay of the injunction pending the appeal Michael Foods would welcome the opportunity to continue the current pricing arrangements between Michael Foods and FISA. In other words if they stipulate to and the court enters a stay then we will do what a stay permits us to do which is act as if the judgment had never been entered. That's all the letter said could we have worded it better perhaps but is it contempt of court to say if we get a court order allowing us to continue our behavior. To continue behavior the district court found to be discriminatory. Yes but only if a stay is entered that's the key to understanding this contempt issue. That paragraph is explicitly conditioned on stipulation to a stay which could not have taken effect without the court's approval and it didn't say we will price in this manner it said we would welcome the opportunity. So that this wasn't a threat this was saying if we get a stay we'll do what a stay permits us to do otherwise we'll comply with our split with the statute by using our explicit statutory right not to deal. Thank you. Yes thank you Judge Smith my name's Glenn Nager may it please the court on counsel for appellant Sodexo. In my argument I'd like to focus on two issues and rest of the remainder of our arguments on our brief. The two issues are the actual competition issue and the Toledo Mac issue. What should Toledo Mac counsel us to do here is most recent jurisprudence in the RPA. I think it should definitely counsel the court to use prudence in construing the RPA. I also think that what Toledo Mac held was that it is perfectly legal under the Robinson-Patman Act to provide a price differential to one prospective buyer versus another prospective buyer if the price differential is provided after the competition between the two prospective purchases is already over. Because as in fact the this court previously held in the Crossroads co-generation case and the Fifth Circuit had held in the MC manufacturing case the Robinson-Patman Act protects not competitive bidders but competitive purchasers. Competitive purchasers are two purchasers who have purchased product for their inventory at discriminatory prices and are competing to resell out of their discriminatory inventory. So what Toledo Mac held following the MC manufacturing case is that it does not violate the Robinson-Patman Act if the favored purchaser has already won the competition before they get the actual discriminatory price. And of course that's exactly what is happening in the context of this case as alleged by Feasers. During the time of the so-called competition over whether or not a client institution will self-operate or will outsource to a food management service company such as Sodexo there are no discriminatory prices being used on sales by Michael Foods. What Michael Foods is doing is selling to all distributors at the distributor level. Is this a bid market? What I would say is that this is a special order as used in the Mack Truck case. What Mack Truck says is as follows Judge Smith that if the competition is over and an order is then made whether you call that a bid market or whether you call it a special order that price differential does not have any cause any competitive injury because the competition isn't going on at that point. So you're saying there's only one sale? That is correct. There is only a discriminatory sale that takes place after the competition is over if it is a discriminatory sale at all. And that's precisely of course what is what is happening in this on a Sodexo purchase order because Sodexo hasn't ordered anything. They don't order any food for a client institution unless and until they've both won the competition and entered into a binding contract. Mr. Negger let me ask you this question. If we find that the district court was in error in misinterpreting and not applying Mack Trucks to this case what relief should we grant? I think you should reverse the judgment below. Was the direction to apply Mack Trucks or should we make a determination? Well I think I think you should make the determination Judge Fisher because these facts that we're talking about when when the purchase takes place at a deviated price Judge Rambo has already made factual findings about that in her opinion. The irony of this case to go to Judge first question to Mr. Engler is the irony of this appeal is that in fact we believe Judge Rambo's factual findings confirm our case on both the actual competition and Mack Trucks issues. And it's her legal conclusions about whether or not Mack Trucks properly applies on these facts at pages A110 and A111 of the joint appendix that we say are in error and it's her legal conclusion at page A23 of the of the appendix that we say is in error and on page A23 if I might address it briefly since I have such short time Judge Smith. Judge Rambo says that it doesn't matter that Sodexo is not performing the broad line distribution function that Feesers performs. She says it's of no significance in determining whether or not Sodexo and Feeser are engaged in actual competition and her reason for saying it's of no significance is she says because Sodexo contracts with distributors to provide distribution services. But that is a legally erroneous conclusion under this court's of the previous panel's decision in this case. The previous panel said we have to ask whether in economic reality Sodexo and Feesers are acting at the same distribution level and when Sodexo enters into a contract with a distributor it's not at the distribution level it's at the distribution level. What it's doing in that situation is the same things that Jones Day has done in this case. We got hired by Sodexo to represent them and they are our customer and they've outsourced the handling of this appeal to Jones Day and we prepared a brief for Sodexo and we hired a printer and that to print that brief and make that brief for us. You make that analogy in your brief. And then we bill Sodexo to reimburse us for the costs of paying the printer and that's exactly what Judge Rambo found that Sodexo is doing with the distributors that it hires to benefit its client institution. It fronts the money and then it gets reimbursement and we respectfully submit that can't be competition in any sense of the word competition particularly under the Robbins and Patman Act which as Judge Smith pointed out this court in Toledo Mac said should be narrowly construed so as to not conflict with the broader purposes of the antitrust laws. The court has no further questions. I see my red light. Thank you Mr. Nager. Mr. Kessler. Good morning Your Honor. My name is Jeffrey Kessler and I am representing Beezer's the atelier in this case. Your Honor, I'll start first with the Volvo Trucks Toledo Mac issue. The argument of counsel suffers from the same defect as their other arguments which that it is an attack on the fact findings of the court, not the legal standard. Judge Rambo applied Volvo Trucks and in doing so what the court found as a matter of fact after a 10-week trial, 10-day trial, felt like 10 weeks but it was 10 days, what the court found was that the competition was continuous as a matter of fact. This was not a situation where you have one switch from self-operation to food management and it stays that way. In fact, what the court found as a interplay, just like there are constant purchases simultaneously by the two competitors. I thought you began by saying you were going to address Toledo Mac and Volvo. So what is the difference between this market and the markets described in Toledo Mac and Volvo? Yes, in Toledo Mac you had just as in Volvo Trucks, a bid market situation where what happened is you have a special order bid, only one person prevails in that bid, the competition ends, over, finished and then there's one person purchasing so there's never contemporaneous purchases. What Judge Rambo found here as a factual matter is that the competition does not end, it continues and the customers will switch back and forth. In fact, we have evidence below of customers not only switching back and forth but even simultaneously purchasing. I'll give you one example of this. How does that distinguish this case from Toledo Mac? Okay, because Feesers and Sodexo are at the same time buying the Michael Foods products at different prices. That never happens in Toledo Mac. Let me give you one specific example of this, the Daniel Boone School District. This is at A, 1988 to 1999. Daniel Boone was a school district that switched from Feesers to Sodexo but then some Michael Foods products were available under a government program, what's called the NOI program and Feesers was in that program and Sodexo wasn't. So at the same time that it was buying products from Sodexo, some Michael Foods products, it decided to buy a few Michael Foods products at the very same moment from Feesers. Continuous competition. This is just one example where it happened at the same time. Many other cases, Feesers is selling the product, Sodexo comes in, Manningham Township was an example of this, comes in, makes a bid to sell them the food at the very same time. So the competition is overlapping and the purchases are contemporaneous. There's no factual dispute in that. In the Toledo Mac situation, the purchases are not contemporaneous. The second purchase never takes place in Toledo Mac. Only one competitor ends up making the purchases. So the factual premise here was rejected by the clearly erroneous standard and they can't address that. They can't show how that the facts in this record of constant continuous competition, which is never the Toledo Mac situation or the Volvo truck situation. Now the factual scenario that you just described, that's the distinct minority of cases of competition between Feesers and Sodexo, isn't it? No, your honor. The NOI was a small number, but in fact, the fact that they were continually going after the same customers, that is not a distinct minority. And your honor, the Robertson-Patman Act, this is not about damages. This is about injunctive relief. So if it is 10 customers, there's a violation. If it's 20 customers, there's a violation. In other words, it doesn't have to be thousands of customers for there to be a potential violation proven here. In fact, because the standard is reasonable possibility. But as to the scenario, you started to talk about Toledo Mac. Yes. And you got into the factual underpinnings. Just looking at the question of whether or not the district court erred in not applying Toledo Mac to the example where Sodexo is attempting to convert an operation over to a managed operation, where you have the one sale example. Yes. There is no one sale example, your honor, in this record. There's not even one example of that. When they convert a customer, the competition continues. It continues, but at the time the institution turns over to a managed operation and Sodexo manages it, and Feesers is out there continuing to be a distributor. As to that location, why shouldn't Toledo Mac be applied? Because the issue in Toledo Mac was there were not simultaneous purchases. It was one purchase, not two. There has to be two purchases under the Robertson-Patman Act. In Toledo Mac, they found the second purchase never takes place of the product. Here, and this is very important factually, the micro foods products are sold continuously. They now say it's customer specific. But at that point, at that point, Feesers is not selling that product to that particular institution. They're bidding to sell. They're not continuing to bid. The bid's appeal was that you argued that, in fact, the parties were competing for the business in a particular institution, whether it was sold directly by Feesers as a distributor, or whether it was being managed by Sodexo. Correct. That's correct. And your honor, in all due respect, where you're wrong on the facts, and that's why the facts are so important here. It is not a situation where, quote, there is a bid and the competition ends. What the record shows is that Feesers continues to call on customers who are food management, and even more prevalently, Sodexo constantly calls on customers of Feesers to switch them the other way. And the churn, and this is in the testimony of the Sodexo executives, was that, and this is in Mr. Rochette. So let me stop you. Save you some of your time. Okay. That's why you're saying Mack Truck should not be a part of it. Exactly. All right. Exactly. Because of the continuous nature, sort of, there are always two purchases. So I'll move on from Mack Truck to another subject. To discuss meeting competition. Again, it's completely factual. What are the facts? This is not a dispute about the legal standard. They want to portray it that way because they want to get rid of the clearly erroneous standard. The first 1999 contract for eggs, there's no evidence that any competitive offer was even alluded to. Nothing. There's no factual evidence. They concede that. So the entire first contract that was issued here, there's zero evidence of even that there was a competitive offer. That's number one. Number two, the last potato contract, 2005. They don't even contend that there was any sense of a competitive offer. So we're now only down to two of the contract, the 2002 contracts. I want to start with that because there's zero evidence for 1999, and it's their burden of proof on meeting competition. For the 1999 contract, let's start first with the egg contract. What was the evidence? The evidence was they never, first of all, they made the discriminatory offer before any competitive offer was even alluded to. So the discrimination, remember this is an issue of good faith intent. They made the offer based on an email that said, this is the big dog in contract management. We need to satisfy them. That's a classic Robinson-Patman Act violation. They're the big dog means they are the big volume purchaser. That's what the district court found. Then at the very end, they alluded to, well, if we don't like your business, we might switch to Sonny Fresh. They never indicated anything about the duration of the offer, the terms, anything. And this is critical, no one ever asked. Michael Foods never even tried to inquire. This is completely- What it says, Your Honor, is the standard is good faith, is false city, which is decided years after the great Atlantic and Pacific case. False city is the governing Supreme Court case. It says in discussing about the meeting competition defense that you look at all of the elements of good faith, which includes reasonable efforts to verify. In fact, the decision of this circuit, the Third Circuit's decision in Viviano, is favorably cited by the Supreme Court on that. Is it always required in every case? No, of course not. No, what the court said in Gibson is that efforts to corroborate the reported discount by seeking documentary evidence or by raising its It's suggesting ways in which evidence might be adduced. Your Honor, are you looking at Gibson or false city? I'm looking at Gibson. Okay, Gibson is five or six years earlier. In false city, so later Supreme Court case governs, the later Supreme Court case indicated that you look at efforts to verify, and in fact, you look at the duration of the offer. You have to have some- That these are requirements or that these are means of proof? These are factors. They're not absolute requirements. Factors. And what I'm saying here is that they are- They are evidentiary suggestions of ways you might go about it. Well, I think on different facts, they're more or less persuasive. In this case, in this case, where the undisputed facts found by the court, and we're on a clearly erroneous standard, are that for two of the contracts, there's no evidence of anything. For the 2002 contract, they offered the discriminatory price before anything was even mentioned about a competitive offer. That's very important, looking at the good faith intent, and they wrote a document saying, we're doing this because of the big dog in contract management, there is no document, and very, very significant.  Sodexo, and they have the burden of proof, did not even produce a witness to say, here's what the competitive offer was. This is a mythological offer. In other words, it was never asked for about by Michael Foods. It was never presented in this court. Compare that to Gibson or the AT&T. They put in the evidence. Here's the competitive offer. Here's what was being met. This offer, there's not a thing in this record to establish what this offer was, what its terms were, what its scope was, and Vicky Wass' testimony is critical. She admitted what she was doing with her testimony, and was basically giving this price because she thought this was a big customer, and they just wanted to do it for the business. That's not enough. If that was enough, the whole premise of the Robertson-Patman Act, that big purchasers can't bid, their discounts don't win. Let me move on, Your Honor, because I see I'm running out of time. Talk about actual competition. What's the significance of the prior rulings in this case? Prior panel of this court, which, of course, is binding, is the law of this case, looked specifically at this issue of functional competition, that was alluded to, and ruled against them on that issue. It's just a re-argument of that. What the court said is that Morton sort of applies in this case. Now, wait a minute. What the prior panel said was that the fact that Fisers is a distributor and Sodexo a manager in management is not dispositive. Correct. Correct. But the economic realities explicitly were then to be considered upon remand and by us, in terms of whether it was a matter of law. Right, and what I'm suggesting is, again, what happened here is Judge Rambo did exactly what the court said, and there was overwhelming factual evidence of actual economic reality competition. All five Sodexo executives admitted to this, five of them. They had to admit to this because their strategic plans said that. Their number one of them, I think it was Mr. Rochef, said, what we do is we convert self up. That's why we're in business, and it goes back and forth. And their number one competitor listed, I'll give you a citation for this. If you look at A1313431, and specifically 13433, this is one of their strategic plans. And they say competitor. What's their first number one competitor? Self operated. And then on the testimony was, what does that mean? And when it turns out what that means was, well, our competitors are there. We're competing with distributors to sell to the self operated who do their own food management and get the distribution and procurement separately. That was the testimony by all of the Sodexo witnesses. They can't come in here now and say, oh, well, we don't really compete. That's not the clearly erroneous standard. This was overwhelmingly supported by the evidence that this competition went on. Their customers testified. This panel said the standard was, are you going for the same food dollars? Their customers- Does Sodexo compete with restaurants? With restaurants? No, it doesn't. No, it doesn't compete with restaurants because it would be a different geographic market. I think if you're in a hospital or an institution, I think someone would eat there as a matter of convenience. You're not going to- I mean, I guess conceivably there could be, you know, that they're operating there. But I don't think that's a relevant issue in this case. But what they do compete for is to procure and distribute food as part of their functions. Does Pizzer's compete with Denny's for the sale of eggs? No, we sell again to institutions. Where we compete with Sodexo is it's the schools, hospitals, institutions. We procure and distribute food to them. And in the Sodexo contracts, the management fee contracts, again, the prior panel looked at this. In those contracts, they break out the food items separately and sell the cost directly. Again, I don't care what you say, but we don't sell food separately. That's not what the prior panel found, and it's not what Judge Rambo found on the facts. Mr. Kessel, let me ask you a question on another area. Please. What specific evidence is there in the record that Sodexo knew or had reason to know that Michael's Foods was engaged in unlawful price discrimination? Ah, excellent. There are- Because the district court did not make an explicit finding on that, did they? Well, no, the district court did find the knowing inducement. And what the district court did in the opinion is say, cited, number one, I'll give you all the evidence. Number one, a whole series of strategic plans and testimony from their executives that their plan was to use their vast purchasing power and leverage to get prices that were not available to smaller competitors and use them affirmatively, which they did in their marketing materials, all of which are in evidence, to switch customers. So not only did they acknowledge they were getting prices that were better than everyone, that was their whole plan. In fact, I- That was their plan, but how did they, in fact, know that Michael's Foods was going along with that? Other than giving them a price, did they know what price Michael Foods was giving to other purchasers? There is no requirement in the law for knowing receipt that you know the specific price. You have to know you're asking for a preferential price. The facts are unequivocal. If you look at the negotiation history, they were asking for a price that was, they knew, and it's clear, there's no dispute, they knew was the best price, better than others. And then they went out, and this is significant, in their marketing materials, they told their customers specifically, we're getting prices that are not available to anyone else. It can get you, one of them said, 5 to 25% less in food costs than anyone else. This was their whole strategy. So of course they knew it, and if they're not, they were misleading all their customers. They were telling them, this is exactly what we're doing, this is how we get our advantage. So this entire strategy is based on that. Again, this is all filled in the record with documents, witnesses, testimony, and there was no dispute. This wasn't our arguing. This was Mr. Rochette, Mr. Paulson, their strategic plans, their marketing materials, their marketing templates. Judge Rambo, who sat there for 10 days, was overwhelmed with this evidence of competition. That's why you got the findings you got. And what they're portraying here is a fact record that doesn't exist, and it's not a legal argument, because the law was exactly what the prior panel told Judge Rambo to do. Any other questions? Thank you very much. Thank you. Mr. Kessler, Mr. Englert, Mr. Budden. Your Honor, we're available for questions. Otherwise, we'll wait in silence. Thank you very much, Mr. Englert, Mr. Nager, Mr. Kessler. The case is a complex one, an interesting one. We thank you for your excellent arguments and your excellent briefing. We'll take the matter under advisement, and we'll take a break.